**UNITED STATES of America,**
**Appellant,**

v.

**BLOOMFIELD STEAMSHIP CO.,**
**Appellee.**

**No. 21793.**

United States Court of Appeals
Fifth Circuit.

April 29, 1966.

Rehearing Denied Aug. 4, 1966.

Lawrence F. Ledebur, Alan Raywid, Attys., Dept. of Justice, Washington, D. C., Woodrow Seals, U. S. Atty., Jack Shepherd, James R. Gough, Asst. U. S. Attys., Houston, Tex., John W. Douglas, Asst. Atty. Gen., Sherman L. Cohn, Atty., Dept. of Justice, Washington, D. C., for appellant.

Robert Eikel, Eikel & Goller, Houston, Tex., for appellee.

Before TUTTLE, Chief Judge, THORNBERRY, Circuit Judge, and LYNNE, District Judge.

TUTTLE, Chief Judge:

This appeal complains of a decision by the trial court declaring that the appellee, Bloomfield Steamship Company, is not liable to the United States for allegedly overcharging for the ocean transportation of Government-financed grain shipments. The suit was commenced by Bloomfield's filing a complaint seeking a declaratory judgment to the effect that it was not liable to the Government. The United States filed a counter claim seeking the recovery of approximately $270,000, the amount by which rates charged the Government allegedly exceeded those charged commercial shippers for comparable service.

Bloomfield is a subsidized American steamship company,[1] operating vessels in liner service.[2] It carried a substantial number of grain shipments to Western Germany during 1958 and 1959, which were financed by the International Cooperation Administration (ICA).[3] During

---

1. Bloomfield received a subsidy designed to place its operations "on a parity with those of foreign competitors." 46 U.S.C. § 1171(a) (4).

2. "Liner service" is characterized by "the carriage of general cargo, the maintenance of schedules * * * and the same freight rates charged to all shippers regardless of the quantity offered." Rosenthal, Techniques of International Trade, 36 (1950). This is to be contrasted to "tramp service"—carriage and vessels not operating on a regular schedule or route.

3. ICA was created within the Department of State as an unincorporated agency of the United States under authority of Executive Order No. 10610 (1955), as amended (see note following 22 U.S.C. § 1781 (1958)), and was authorized to implement and execute certain programs and functions specified in the Mutual Security Act of 1954, as amended, 22 U.S.C. §§ 1750–1951 (1958). All activities of ICA were conducted pursuant to the Mutual Security Act and ICA Regulation 1, as amended, 22 C.F.R. 201.1–201.25 (1958). ICA Regulation 1 is a compilation of the administrative rules and procedures under which ICA financed the procurement of commodities and related services, including ocean transportation, for the Federal Republic of Germany and other cooperating countries during the pertinent periods.

the period involved, Bloomfield carried 192 separate parcels of bulk grain between United States Gulf ports and ports of Northern Europe. Forty-eight of these were financed by ICA under procurement authorizations issued to the Federal Republic of Germany, its agents or designees. The other 144 parcels were privately financed.

There were no conference agreements or tariffs fixing the freight rates for these shipments, but, instead, in each case they were separately negotiated and agreed upon between the agents for the German importers on the one hand, and the agents for the shipping line on the other. These negotiations culminated in "fixtures," or agreements as to the terms, and were reduced to written "booking notes" signed by the negotiators. Each booking note subjected the proposed shipment to ICA rules and regulations. The regulation pertinent to this litigation, 22 C.F.R. 201.7(b), provides:

"The rate charged by a supplier of ocean transportation services shall not exceed the prevailing rate for similar freight contracts nor the rate paid to the supplier for similar ocean transportation services by other customers similarly situated."

Bills of lading, issued at loading, contained similar provisions. Following the loading of ICA shipments, Bloomfield's agents billed Glaessel Shipping Corporation, agents for the cargo. Each of these shipments was then paid for with United States Government funds. Each invoice was accompanied by an executed copy of Form ICA-280, a required "Supplier's Certificate" which contained the same representation heretofore referred to:

"The rate indicated on the reverse of this form for the service rendered does not exceed the prevailing rate, if any, for similar services, or the rate paid to the supplier for similar services by other customers similarly situated."

The privately financed shipments carried by Bloomfield during this same period were negotiated in the same manner, culminating in "fixtures" and reduced to "booking notes." The Record seems to disclose, and counsel frankly conceded on oral argument, that there were no significant differences as to the nature of the cargo or other services performed by Bloomfield Steamship Company as between the ICA-financed shipments and those that were privately financed, except for the inclusion on the former of the language subjecting the ICA-financed shipments to ICA rules and regulations. The trial court found "the parties stipulated at length to data extracted from 192 ocean bills of lading covering partial shipments of bulk grain transported during the years 1958 and 1959 between United States Gulf ports and ports of Northern Europe aboard Bloomfield vessels. These stipulations clearly show that the rates for Government financed shipments were substantially higher in all cases than the rates for commercial shipments during the same time periods. (Emphasis added)."

Although describing the Government's position as "a compelling one," the trial court nevertheless denied recovery on a theory, advanced by Bloomfield, that the ICA regulations and the bill of lading incorporating these regulations, were not to be given effect by reason of what the trial court found to be a contrary Government policy as embodied in the Cargo Preference Act.[4] This is the statute that provides that, "Whenever the United States shall procure, contract for, or otherwise obtain for its own account, or shall furnish to or for the account of any foreign nation without provision for reimbursement, any * * * commodities, within or without the United States, * * * the appropriate agency or agencies shall take such steps as may be necessary and practicable to assure that at least 50 per centum of the gross tonnage of such * * * commodities * * * which may be transported on ocean vessels shall be transported on privately owned United States-flag commercial vessels, to the extent such vessels are available at fair and reasonable rates for Unit-

---

4. 68 Stat. 832, 46 U.S.C. § 1241(b).

ed States-flag commercial vessels, in such manner as will insure a fair and reasonable participation of United States-flag commercial vessels in such cargoes by geographic areas."

The trial court held, in effect, that this provision of the statute established a policy that all shipments made because of the requirements of the Cargo Preference Act should be paid for by the United States at whatever charges were negotiated with the carrier so long as they were "fair and reasonable rates for United States-flag commercial vessels," even though the same carrier might be carrying the same commodity between the same ports for non-governmental shippers at substantially lower rates and notwithstanding agreement of the carrier as embodied in the bills of lading and the execution of the certificate of parity of charges by the carrier as has been outlined above.

The Government's claim for money had and received is based upon Bloomfield's breach of an express warranty that it was charging the Government no more than it was charging others for similar services. Bloomfield's contention in the trial court and here is that these were not "similar services" because in one case the services were performed for private shippers, whereas, in the other, they were performed for the United States Government. The trial court seems to have accepted this theory when it made an express finding that the rates charged the Government "did not exceed (a) those prevailing for similar freight contracts, nor (b) those paid to suppliers for similar ocean transportation, at or about the same time by other customers similarly situated" and the further finding that "those Bloomfield customers which shipped commercial grains on Bloomfield vessels, at rates which the Government compared with Bloomfield rates on Government-financed grain shipments in an attempt to establish the illegality of the latter, were not similarly situated to the Bloomfield customer which contracted for the carriage of Government-financed grain and rates here in controversy."

These findings could be true only if the fact that in one case the Government financed a shipment and in the other it was not so financed created a dissimilarity in the shipment.

We conclude that there is no justification for a writing out of the contract between the shipper and the carrier the express warranty that the rate charged the Government did not "exceed * * * the rate paid to the supplier [Bloomfield] for similar services by other customers similarly situated." This is a case of first impression. Bloomfield cites no cases to support its contentions.

There is nothing in the Cargo Preference Act that indicates that it is intended to fix freight rates. The American shipping industry, having convinced Congress that it had grave difficulties in competing on an even basis with foreign bottoms, was the beneficiary of the subsidy provisions of the Merchant Marine Act.[5] Appellee here contends that *sub silentio* Congress also intended to provide further subsidies by having the Government pay higher rates for shipping than it might bargain for.

The thrust of appellee's contention is that, even though the Cargo Preference Act undertook to guarantee that at least 50 per cent of programmed commodities be transported by United States-flag commercial vessels, if they were available at fair and reasonable rates, and, even though Congress has provided further aid to the American flag carriers by allowing a subsidy to take up the slack between the cost of operations of foreign carriers as compared with that of American carriers as to shipments actually made, Congress also intended to prescribe that carriers could not validly agree to carry Government-financed shipments at a charge that was competitive with its charges for commercial shippers if such competitive rates are lower than rates shown to be fair

5. Supra, fn. 1.

and reasonable. We read no such policy in the Cargo Preference Act. In fact, it appears that the whole policy expressed in Sections 16 and 17 of the Shipping Act of 1916,[6] is to prohibit unreasonable preferences or advantages to any particular person, locality, or description of traffic. It is not reasonable to assume that Congress does not intend that the American taxpayers shall benefit from this principle of non-discriminatory charges. When coupled with the express provisions of the ICA regulations and the contract freely entered into between the shipping company and the purchaser of the grain, there can be no justification for a conclusion that the United States should not be benefited by the contract as written.

The Government made no effort to attack the fairness or reasonableness of the rates here paid. Under its theory of the case, this was irrelevant. It appears that the element of fairness and reasonableness was itself related to the Government-financed shipments.[7] It does not appear that the rates are such as would have been approved as reasonable or fair if they were tested against the ordinary standard of charges for commercial shipments which were not Government-financed. It cannot therefore be said that, in insisting upon compliance with the warranty and certificate, the Government is demanding reimbursement because it has the legal right to insist on an inequitable rate. It seeks only what non-governmental shippers obtained by contract, and what it also obtained by contract. There should be no distinction between them for the carriage over the same line, the same distance, and under the same circumstances. See Wight v. United States, 167 U.S. 512, 517, 17 S.Ct. 822, 42 L.Ed. 258.

Counsel for appellee candidly conceded on oral argument that appellee's contention that the particular charges here had been "approved" prior to shipment is significant only to the extent that the court accepts its theory of the case; that is to say, only if the court construes the Cargo Preference Act as requiring that the standard of rates shall be what is fair and reasonable without any option to the parties to agree that cargoes carried at Government expense shall be charged at rates as low as those carried for other shippers.

The trial court did not make a determination as to the amount of the charges in excess of the rates charged for similar commercial shipments. This determination must be made on remand.

The Judgment is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

---

6. 46 U.S.C. §§ 815, 816.

7. The trial court said:
   "The government made no attempt to show that Bloomfield's rates on their government financed shipments were in excess of rates normally charged for similar service on *government-financed* cargoes, and there is adequate evidence to the effect that other shippers charged similar rates on *government-financed* cargoes." (Emphasis added)