**UNITED STATES of America**

v.

**LYKES BROTHERS STEAMSHIP CO., INC.**

**Civ. A. No. 71-972.**

United States District Court,
E. D. Louisiana.

Jan. 8, 1973.

Gerald J. Gallinghouse, U. S. Atty., John R. Schupp, Asst. U. S. Atty., New Orleans, La., David V. Hutchinson, Admiralty and Shipping Section, U. S. Dept. of Justice, Washington, D. C., for plaintiff.

Edward S. Bagley, Terriberry, Carroll, Yancey & Farrell, New Orleans, La., for defendant.

HEEBE, Chief Judge:

The above-entitled action was brought by the United States to recover alleged overcharges in the amount of $6,115.43 [1] for ocean transportation by Lykes Brothers Steamship Co., Inc., of government-financed shipments. The suit is now before this Court on the motion of defendant, Lykes, for summary judgment.

1. This is the amount alleged in the government's complaint. However, in the government's memorandum, the amount is calculated as $6,730.01 on seven shipments, which appears to be the accurate figure.

Basically, the facts are not in dispute. Lykes, a common carrier by water in the foreign commerce of the United States, is a member of the Gulf/Mediterranean Ports Conference. This Conference is a rate-fixing authority subject to the jurisdiction of the Federal Maritime Commission, under the Shipping Act, 46 U. S.C.A. § 814. In 1965, 1966 and 1967 Lykes undertook to carry a number of CARE (Cooperative for American Relief Everywhere, Inc.) shipments from United States ports to Trabzon and Samsun, Turkey. The freight charges on these shipments were financed by the Agency for International Development (A.I.D.), Department of State, an agency of the United States.

In administering its foreign assistance program, A.I.D. undertakes to pay the freight charges incurred by private relief agencies, such as CARE, in order to encourage famine relief programs. To insure that the shipper (here CARE) will obtain a competitive price from the carrier (here Lykes), in view of the fact that A.I.D. finances the charges as a third party, freight costs are financed without prior investigation but documentary assurances are required from the carrier and post-sale audits and investigations are conducted. In connection with each of the shipments, Lykes was required to execute a Supplier's Certificate ("Voluntary Agency and Carrier Certificate," AID Form No. 10–165[3–63]), pursuant to A.I.D. regulations, 22 C.F.R. §§ 202.3 and 202.4. These certificates contained the following representation:

> "13. Certificate of Ocean Freight (1) The undersigned hereby certifies to the Agency for International Development (A.I.D.) under penalties provided by law that (i) he is entitled under the contract of carriage to the sum charged to the shipper-voluntary relief agency and (ii) the sum

charged to the shipper-voluntary relief agency does not exceed the prevailing rate, if any, for similar services or the rate paid to the undersigned for similar services by other customers similarly situated.

> "(2) The undersigned agrees that upon request of the Administrator of A.I.D. he will promptly make refund to A.I.D. of the sum charged to the shipper-voluntary relief agency in the event of nonperformance of any of the terms of the contract of carriage or for breach of any of the terms of this certificate."

The Gulf/Mediterranean Ports Conference Agreement, to which Lykes is a signatory, covers transportation of cargo, and its transshipment,[2] to all Turkish ports. In addition, the Conference Agreement states (under Paragraph 1) that ". . . all freight and/or other charges for the transportation of cargo between the aforementioned ports shall be quoted, charged and collected by the parties hereto strictly in accordance with the tariffs of rates and charges agreed to by the parties . . . ." Accordingly, the freight rates which Lykes charged CARE on the shipments were in accordance with the tariffs of the Gulf/Mediterranean Ports Conference on file with the Federal Maritime Commission and identified as Gulf and South Atlantic Mediterranean (excluding Spain) Tariff No. 8 (FMC–1) and Tariff No. 10 (FMC–5). All of the shipments were carried from United States ports to the principal port of Istanbul, Turkey, which is designated as a "base port." From there they were transshipped on Turkish National Maritime Line vessels to the lesser ports of Samsun and Trabzon, Turkey, which are designated as "outports." For this carriage, Lykes charged the base port rate applicable under the Conference tariff for the portion of the shipments from

---

2. In its Preamble, the Gulf/Mediterranean Ports Conference Agreement exempts only transshipments destined for ports not included within its terms. The applicable language reads: " . . . traffic moving on through bills of lading for transshipment at a port within the scope of this agreement, but destined to ports not included in the scope of this agreement, does not come within this agreement."

the United States ports to Istanbul. An additional charge was assessed for the carriage on the transshipments to the outports, termed on "outport arbitrary" or "arbitrary," based on Conference tariffs. This procedure is customary in the formulation of ocean freight tariffs. The applicable tariffs are cited above. Lykes has stipulated that the total charges to Lykes for freight and port operations payable to the Turkish Lines for the transshipments from Istanbul to Samsun and Trabzon were less than those charged CARE by Lykes under its arbitrary rate. Lykes does not stipulate, however, that the Turkish Lines' charges to it included any other costs that it incurred on the transshipment as the originating carrier.[3]

From the affidavit of the Vice President-Traffic of Lykes, we note that Lykes incurred a number of other costs, expenses and liabilities on transshipments which ". . . include the cost of effecting delivery from the berth occupied by the Lykes vessel to the berth occupied by the Turkish vessel, forwarding fees in connection therewith, etc. In addition, there are numerous less tangible costs incurred by Lykes including time of its personnel in the United States in arranging transshipments, cabling instructions to its agents abroad, maintaining knowledge as to the availability of transshipment services and their approximate cost, etc. Further, Lykes remains liable as a carrier on its bill of lading until the final discharge of the cargo by the Turkish National Maritime

Lines at Trabzon . . . ."[4] These additional expenses have not been disputed by the government and the Court has no knowledge of how substantial they are. However, the Court notes that on the seven transshipments, the overcharges asserted by the government (the difference between what Lykes charged CARE and what was in turn charged by TNML to Lykes) were as follow:

| | | |
|---|---:|---:|
| TNML | $ 450.08 | |
| SS SYLVIA LYKES | 281.62 | |
| Excess | | $ 168.46 |
| TNML | 450.08 | |
| SS SYLVIA LYKES | 255.50 | |
| Excess | | 194.58 |
| TNML | 5,452.00 | |
| SS AIMEE LYKES | 3,463.52 | |
| Excess | | 2,088.48 |
| TNML | 2,200.38 | |
| SS BRENTON LYKES | 1,296.84 | |
| Excess | | 903.54 |
| TNML | 1,576.15 | |
| SS BRENTON LYKES | 1,051.89 | |
| Excess | | 524.26 |
| TNML | 3,186.38 | |
| SS JESSEE LYKES | 2,500.77 | |
| Excess | | 685.61 |
| TNML | 4,243.43 | |
| SS JESSEE LYKES | 2,078.35 | |
| Excess | | 2,165.08 |
| TOTAL EXCESS | | $6,730.01 |

The issue here involves what is intended in the Suppliers' Certificate when it is agreed that the carrier will charge the shipper a sum which "does not exceed the prevailing rate, if any, for similar services or the rate paid to the undersigned for similar services by other customers similarly situated." The government asserts that there is a ques-

---

3. However, even where there are no additional expenses incurred by the originating carrier on a transshipment, it is not unprecedented for the carrier to receive a higher rate than is incurred by the carrier on the transshipment. See, Carver, Carriage by Sea, 12 Ed., Vol. 2, ¶ 768: "Right to tranship. The voyage ought to be completed in the same ship. But 'if by reason of the damage done to the ship, or through want of necessary materials, she cannot be repaired at all, or without very great loss of time, the master is *at liberty* to procure another ship to transport the cargo to the place of destination; it cannot be

put as a duty. And having done so, although at a rate of freight lower than that agreed for in the original contract, he will be entitled to the full agreed freight should the goods arrive.'" [Citing Shipton v. Thornton (1838) 9 A. & E. 314; 1 P. & D. 216.]

4. The government has not alleged that, on its own, the shipper could not have shipped directly to Istanbul on a Lykes vessel, taken possession of the cargo there and made independent arrangements for transshipment on TNML vessels to Samsun and Trabzon such as were made by Lykes.

tion of fact as to what was the "prevailing rate" for transshipments from Istanbul to Trabzon and Samsun. Its theory of recovery is based on a breach by Lykes of its certifications and not upon any violations of the Shipping Act. The government does not deny that Lykes charged the shipper, CARE, rates in accordance with its tariffs filed with the Federal Maritime Commission. Nor does the government dispute that the carriage under the contract was performed. Its position is that the sum charged by Lykes exceeded "prevailing rates" in that the "prevailing rate" under these circumstances is the rate charged under the Turkish National Maritime Line tariff and available to shippers in Turkey. The government further asserts that Lykes knew or should have known that its tariffs were not the "prevailing rate" in Turkey and was, therefore, required to revise its tariffs accordingly. Failure to do so constituted a breach of the certification.

Lykes has asserted that the only rate applicable to the transportation in question was the rate which Lykes charged the shipper, including the base port rate and the arbitrary. Both of these were specified in the tariffs of the Gulf/Mediterranean Ports Conference to which Lykes was required to adhere. Lykes' position is that the rates charged were not only the "prevailing rate" but also the rate paid "for similar services by other customers similarly situated" and that any question as to what is the "prevailing rate" is a question of law. Lykes states through affidavit that similar shipments during the period in question, whether privately financed or financed by the government, would have been shipped at the same rate as the government was charged for the shipments in question. The further point is made that these rates, including the arbitrary, would have applied if the carriage was completed on the initial Lykes vessel or if transshipped at Istanbul or any other port on a second Lykes vessel, a TNML vessel or a vessel of another line. In fact, the same rate would have applied even if the Lykes vessel had called directly at the outport. Lykes characterizes the government's position as one which seeks to fragment the rate between Lykes' tariff for the base rate and that charged by an independent carrier, not a party to the single bill of lading, which bill of lading governed the entire carriage from the United States port to Trabzon or Samsun.

The Fifth Circuit in Robbins Tire & Rubber Co. v. United States, 462 F.2d 684 (1972), has held that where only one reasonable meaning may be ascribed to words chosen to form an agreement, disputes as to their meaning are to be resolved by the court as a matter of law.

United States v. Bloomfield Steamship Co., 359 F.2d 506 (5th Cir.1966), is the only case which has been cited to this Court by both parties dealing with interpretation of similarly worded government-required certificates. There, the court found that it was faced with a case of first impression. The *Bloomfield* case also dealt with alleged overcharges on the ocean transportation of government-financed grain shipments. Forty-eight shipments were involved, and the amount sought to be recovered was approximately $270,000. Aside from the difference in size of the alleged overcharge, in *Bloomfield*, as distinguished from the case before this Court, there were no conference agreements or tariffs fixing the freight rates for the shipments. The freight rate on each shipment was separately negotiated. The bills of lading and invoices contained the representation that:

"The rate indicated on the reverse of this form for the service rendered does not exceed the prevailing rate, if any, for similar services, or the rate paid to the supplier for similar services by other customers similarly situated."

Bloomfield Steamship Company also negotiated freight rates at the same time on privately financed shipments of grain which were substantially lower in all cases than the rates for the govern-

ment shipments. Bloomfield Steamship Company contended that the *services* were not *similar* "because in one case the services were performed for private shippers, whereas, in the other, they were performed for the United States Government." However, the court found that the fact that the shipments were. financed differently did not create a dissimilarity in the shipment. In holding for the government, the court found that the government sought "only what nongovernmental shippers obtained by contract, and what it also obtained by contract. There should be no distinction between them for the carriage over the same line, the same distance, and under the same circumstances." United States v. Bloomfield Steamship Co., *supra*, at p. 510.

In the case before us, there is a "prevailing rate" in the United States, governed by the tariffs proscribed under the Conference Agreement, and a "prevailing rate" for the transshipment in Turkey. However, the "prevailing rate" in Turkey is not one for services similar to those provided the government by Lykes. Lykes charged CARE the rate it was legally obligated to charge for shipments originating in the United States and would have charged other shippers for "similar services," i.e., shipments on the same line, the same distance from United States ports to Samsun and Trabzon, Turkey, under the same circumstances.

■ The Court agrees with Lykes that the carriage should not be fragmented into two parts for the purpose of determining what constitutes "similar services." Lykes' tariff constitutes a unitary rate, determined by two factors. The rate applied to a single bill of lading entered into in the United States. The government's position is much like the one which it took unsuccessfully in United States v. Kansas City Southern Railway Co., 217 F.2d 763 (8th Cir. 1964), which dealt with a tariff which represented a composite amount representing line-hauling of export grain and terminal services. The Court found that

there was ample basis to view the tariff as representing an integrated or unitary charge. In this case, however, the government had not availed itself of the terminal services, and the court went on to say that "whether some particular situation of less-than-full rendition by the carrier of all the services covered by the unitary rate, such as here, might on its circumstances make the rate an improper carrier charge in its transportational significance or relationship so as to call for a deduction or allowance . . ." would be a matter wholly within the cognizance of the Interstate Commerce Commission. United States v. Kansas City Southern Railway Co., *supra*, p. 768. In the suit before us, however, the government has consistently held to its position that it is not attacking the fairness or reasonableness of the rates charged. Of course, if it were, the Federal Maritime Commission and not this Court would have jurisdiction. 46 U.S. C.A. § 817(a).

■■ Our determination, as the government recognizes, is limited to contract interpretation. In further pursuing the question of whether the government's interpretation of the language in question can be judicially determined to be reasonable, we turn to the fact that the certificate requirement is stated in the disjunctive. We read the certificate as containing alternative representations. Even if it could be said that the "prevailing rate" for "similar services" means that rate charged by the Turkish lines, we think that Lykes satisfied the second alternative, i.e., that it charged "the rate paid to the supplier for similar services by other customers similarly situated." There can be no question but that United States shippers (customers similarly situated) would have been charged the same rate, a rate based on the applicable tariff which Lykes was bound to charge, for similar services.

This Court finds that the certificate language clearly encompasses the published tariff which was the basis for the rate charged by Lykes. Lykes has asserted, in answer to the government's

claim that Lykes "was required to revise its tariffs" in accordance with the Turkish Line's rate that: "Since the certificates were executed long after the shipments were made, there was no manner in which the tariffs could have been revised [if this had been in any manner indicated—which it was not] since tariffs are not subject to revision on an *ex post facto* basis except for administrative errors in the tariff 'of a clerical or administrative nature or an error due to inadvertence in failing to file a new tariff,' 46 U.S.C.A. § 817(b)(3). No such error or inadvertence was committed in the filing of the tariff here which stated the rate which Lykes considered appropriate to the service which it was rendering to the areas in question." The government has not sought to refute this. Accordingly,

It is the order of the Court that the motion of defendant, Lykes Brothers Steamship Co., Inc., for summary judgment, be, and the same is hereby, granted.