# MARAD Rulemaking Authority Under Cargo Preference Laws

The U.S. Maritime Administration has the authority to promulgate rules establishing mandatory uniform charter terms for the carriage of cargoes subject to the Cargo Preference Act of 1954.

April 19, 1994

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
DEPARTMENT OF TRANSPORTATION

This responds to your letter requesting our opinion whether the U.S. Maritime Administration ("MARAD") has authority to promulgate rules establishing mandatory uniform charter terms for the carriage of cargoes subject to the Cargo Preference Act of 1954, section 901(b) of the Merchant Marine Act of 1936, as amended ("MMA"), Pub. L. No. 83-664, ch. 936, 68 Stat. 832, 1034 (1954) ("CPA"). In addition to the submission accompanying your letter, on November 23, 1993, the Department of Agriculture ("USDA") and the U.S. Agency for International Development ("USAID") each submitted memoranda setting forth their views in opposition to MARAD's position (hereinafter cited as "USDA Mem." and "USAID Mem."). On January 25, 1994, we received a final submission from MARAD in reply to the submissions of USDA and USAID.

We conclude that MARAD's statutory authority is broad enough to warrant issuance of charter term regulations. Under the CPA, agencies are only required to allocate the targeted share of cargo to U.S.-flag carriers to the extent that shipment on such carriers is available at "fair and reasonable rates." The proposed regulations appear to be a reasonable means of containing charter-related pass-through costs incurred by U.S.-flag carriers in the preference trade, thereby helping those carriers to maintain "reasonable" rates and to utilize the full statutory allocation of cargo preference, both overall and by "geographic areas," *see* 46 U.S.C. app. § 1241(b)(1). MARAD has explicit authority to issue regulations governing federal agencies in the "administration" of their cargo preference programs, and there is persuasive historical evidence that such program administration, as understood by Congress, encompasses the promulgation of charter party terms.

## I. BACKGROUND

### A. *The Cargo Preference Act of 1954*

This dispute centers around the nation's cargo preference laws, which require that a minimum percentage of ocean cargo generated by certain U.S. government programs (e.g., foreign food aid grants or foreign purchases financed by U.S. Gov-

78

ernment loans) must be transported in U.S.-flag vessels. The Cargo Preference Act provides in relevant part:

> Whenever the United States shall procure, contract for, or otherwise obtain for its own account, or shall furnish to or for the account of any foreign nation without provision for reimbursement, any equipment, materials, or commodities, within or without the United States, . . . the appropriate agency or agencies shall take such steps as may be necessary and practicable to assure that at least 50 per centum of the gross tonnage of such equipment, materials, or commodities . . . which may be transported on ocean vessels shall be transported on privately owned United States-flag commercial vessels, to the extent such vessels are available at fair and reasonable rates for United States-flag commercial vessels, in such manner as will insure a fair and reasonable participation of United States-flag commercial vessels in such cargoes by geographic areas . . . .

46 U.S.C. app. § 1241(b)(1). As a result of amendments enacted in the 1985 Farm Bill, the percentage of food aid program shipments subject to cargo preference was increased from 50% to 75%. Food Security Act of 1985, Pub. L. No. 99-198, 99 Stat. 1354, 1496, 46 U.S.C. § 1241b.

In 1970, Congress enacted section 27 of the Merchant Marine Act of 1970, Pub. L. No. 91-469, § 27, 84 Stat. 1018, 1034, which added the following explicit cargo preference rulemaking authority as § 901 of the MMA:

> Every department or agency having responsibility under this subsection shall administer its programs with respect to this subsection under regulations issued by the Secretary of Transportation. The Secretary of Transportation shall review such administration and shall annually report to the Congress with respect thereto.

46 U.S.C. app. § 1241(b)(2). Based on this authority (delegated to MARAD by the Secretary of Transportation, *see* 49 C.F.R. § 1.66(e)(1993)), MARAD has promulgated regulations governing participating agencies in the administration of their cargo preference responsibilities. 46 C.F.R. pt. 381 (1992). Those regulations establish various reporting requirements, rules governing the cargo "mix" of covered shipments, and other matters relative to compliance with the CPA's requirement for allocating a minimum cargo share to U.S-flag carriers. However, none of the existing CPA regulations purports to establish or regulate the substantive terms of cargo charters utilized by agencies in contracting for shipments covered by the CPA. MARAD's attempt to promulgate regulations that would do just that gave rise to this dispute between MARAD and the chief agencies (USDA and USAID) administering food aid programs subject to cargo preference.

## B. *Agricultural Export Programs*

USDA and USAID both participate in various overseas food aid programs involving shipments covered by the CPA, including programs authorized by the Agricultural Trade Development and Assistance Act of 1954, as amended, 7 U.S.C. §§ 1691-1738r, commonly known as "Public Law 480." Under these programs, agricultural commodities and other forms of food aid are shipped overseas to foreign governments pursuant to grants or U.S. Government-financed purchases. USDA is in charge of market development credit sales to friendly developing countries under title I of Public Law 480, while USAID is in charge of grant programs for emergency food assistance and food donation programs benefiting least developed countries under titles II and III.

In 1990, Public Law 480 was amended to provide the Secretary of Agriculture and the AID Administrator with certain additional powers in connection with the administration of their respective food aid programs. *See* 7 U.S.C. § 1736a(a)(2) (USDA) and (d)(2), (4) (USAID). These provisions authorize the Secretary and the Administrator to purchase ocean transportation for their program shipments under such competitive bid procedures as they consider appropriate. USDA and USAID contend that the imposition of uniform charter party rules by MARAD would undercut their ability to establish such competitive bidding procedures.

## C. *MARAD's Proposed Rule*

The proposed rule that precipitated this dispute was developed by MARAD in response to complaints from U.S. shipowners that they were being adversely affected by various practices in the awarding of cargo preference ocean transport contracts, referred to as "charter parties." *See* Liberty Maritime Corporation; Filing of Rulemaking Petition, 57 Fed. Reg. 8287 (1992).[1] In brief, the shipowners claim that U.S. agencies administering CPA programs, as well as recipient nations, have increasingly included terms and conditions in charter parties that place an excessive burden of cost and risk upon the shipowner, as opposed to the shipper or the recipient. Thus, MARAD's notice of proposed rulemaking stated that it was issued "in response to vessel owners' complaints of discriminatory, non-commercial contracting terms in the preference trade." NPRM at 1.[2] An important example of such objectionable terms is a provision requiring the shipowner (as opposed to the charterer or the recipient nation) to absorb the added costs caused by delays in unloading the cargo. As the NPRM continued:

---

[1] MARAD's draft notice of proposed rulemaking ("NPRM") defines "Charter Party" as "a contract between the cargo charterer and the vessel owner/operator reflecting the terms and conditions agreed to by both parties regarding the shipment of the cargo " NPRM at 18 The draft NPRM was transmitted to the Office of Management and Budget ("OMB") for pre-promulgation clearance on December 29, 1992, but it was not cleared by OMB due to the inter-agency legal dispute over MARAD's authority to issue it.

[2] The shipowner's petition also asked MARAD to issue a rule requiring sealed bidding in all CPA charter tenders, but MARAD declined to include such a requirement in the NPRM.

> These discriminatory terms increase vessel owners' costs and risks. This, in turn, causes higher freight rates and unnecessary expenditure of U.S. Government funds. Currently, there is a vast array of contracting procedures affecting U.S. flag vessels carrying preference cargoes; some programs have uniform charter parties containing minimal onerous, non-commercial terms, whilst others allow a multiplicity of nonstandard, discriminatory charter parties. . . . This regulation attempts to harmonize all the disparate charter parties into one consistent, orderly, fair and commercially justifiable charter party.

*Id.* 1-2.

The MARAD proposed rule would (1) require MARAD's pre-approval of all freight tenders (i.e., bid solicitations) for CPA charter parties; and (2) require the utilization of a uniform charter party ("UCP") by all agencies in arranging for their CPA program shipments. The mandatory provisions proposed for the UCP encompass a range of subjects, including loading and discharging conditions and procedures; shipment cancellations due to delays; procedures for handling bills of lading; arrangements for the use of stevedores; and various rules and procedures for allocating contractual responsibility with respect to the timeliness of various actions (e.g., readiness to load or discharge the cargo).

The NPRM described the anticipated effect of the proposed rules as follows:

> It would substantially affect the operation of U.S.-flag vessels in the preference trade by improving their prospects for achieving a reasonable profit through eliminating unfavorable conditions now existing under the affected Government sponsored programs. Based on a survey of participating vessel owners, adoption of these uniform charter party provisions could result in significant annual savings.

NPRM at 16.

MARAD contends that it has authority to promulgate the UCP regulations under 46 U.S.C. app. § 1114(b) and 46 U.S.C. app. § 1241(b)(2). Both USDA and USAID contend that those provisions do not authorize MARAD to impose substantive charter terms on agencies administering cargo preference programs. Those agencies also contend that MARAD's attempt to impose mandatory terms to govern all CPA cargo charters conflicts with the statutory powers assigned to them under the foreign food aid programs.

## II. ANALYSIS

### A. *The Secretary's General Authority under § 204(b) of the MMA*

We first examine the general authority given the Secretary of Transportation under section 204(b) of the MMA, 46 U.S.C. app. § 1114(b), to ascertain whether

it provides a legal basis for issuance of the charter term regulations. That section provides that the Secretary is "authorized to adopt all necessary rules and regulations to carry out the powers, duties and functions vested in [him] by [the Act]." *Id.* Construing the Secretary's authority under section 204(b) in *States Marine Int'l. v. Peterson*, 518 F.2d 1070, 1079 (1975), *cert. denied*, 424 U.S. 912 (1976), the U.S. Court of Appeals for the D.C. Circuit observed:

> [U]nder this grant of authority the Secretary . . . has broad discretionary authority to deal with the everchanging technological and economic conditions of the commercial shipping industry, as long as its actions are reasonable and consistent with the 1936 Act.

The legislative history underlying section 204(b) confirms that Congress intended to give the Secretary broad (but not unlimited) authority and discretion to respond to problems afflicting the U.S. merchant shipping industry. As stated in the Senate Commerce Committee Report on the 1936 Act:

> Title II creates a Maritime Authority . . . . The Authority is given a considerable amount of discretion in the solution of its problems. This discretion is necessary since many questions will require prompt treatment. Shipping is a business of a highly competitive and constantly changing nature, and its governmental contact must be given the power of prompt decision in dealing with situations as they arise. Such discretion, however, must have limits, and in framing the bill it has been our endeavor to confer no greater powers than are necessary and proper considering the ends in view.

S. Rep. No. 74-713, at 4 (1935).

These authorities raise the question of whether MARAD's issuance of the proposed regulations is both a reasonable response to developments in the merchant shipping business and consistent with the 1936 Act.

There seems little doubt that the proposed regulations are "consistent with the 1936 Act." That Act was intended "to help develop an American merchant fleet that would be competitive with foreign flag fleets." *Peterson*, 518 F.2d at 1076. We think MARAD could reasonably determine that regulating charter parties in a manner designed to eliminate terms having a disproportionately adverse affect on U.S.-flag carriers would further the competitive interests of the U.S. merchant fleet. Thus, the proposed regulations appear generally consistent with the permissive standards for sustaining regulatory actions by the Secretary under the general authority of section 204(b) of the MMA. In that regard, cases construing the

MMA have been consistently deferential to the Secretary's discretion in regulating merchant shipping matters.[3] As stated by the Federal Circuit in *American President Lines, Ltd. v. United States*, 821 F.2d 1571, 1578 (Fed. Cir. 1987), "The [Merchant Marine] Act gave the Secretary very broad powers and authority and wide discretion in administering programs under its provisions."

Thus, the language and judicial construction of section 204(b) confirm that it constitutes a broad grant of discretionary authority and indicate that the Secretary's issuance of regulations reasonably framed to enhance the competitiveness of the U.S. merchant fleet would normally fall within that authority. However, although this factor lends support to MARAD's position, we do not view the breadth of section 204(b)'s grant of *general* regulatory authority as necessarily conclusive on the more specific and difficult question posed here: Whether the Secretary's admittedly broad rulemaking authority within his areas of statutory responsibility encompasses the power to dictate the specific terms that must be included in contracts governing cargo preference charters *issued by other federal agencies*.[4] Resolution of this question must address the more particular grant of regulatory power found in the CPA itself, 46 U.S.C. app. § 1241(b)(2).

## B. *The Secretary's Authority under § 901(b)(2) of the MMA*

1. *"Administration" of Cargo Preference "Programs".* In 1970, Congress amended the CPA to provide that, "Every department or agency having responsibility under this subsection [i.e., the CPA] shall administer its programs with respect to this subsection under regulations issued by the Secretary of [Transportation]." MMA, § 901(b)(2) (codified as amended at 46 U.S.C. app. § 1241(b)(2)). The Senate Commerce Committee Report explained the purpose behind the amendment.

> The Committee amended the bill to provide that each agency having responsibilities under [the CPA] will administer its program with

---

[3] *E.g., Seatrain Shipbuilding Corp v Shell Oil Co*, 444 U.S 572, 585 (1980) (Secretary's broad contracting powers and discretion to administer the MMA encompassed authority to release shipowner from its obligation to operate subsidized ship exclusively in foreign trade); *American President Lines, Ltd*, 821 F 2d at 1578 (court defers to Secretary s authority to charge buyer only one-half of layup costs in determination of trade-in allowance under obsolete vessels trade-in program, stating, "The Act gave the Secretary very broad powers and authority and wide discretion in administering programs under its provisions "), *American Maritime Ass'n v United States*, 766 F 2d 545, 560 (D C Cir 1985) ("*AMA*" case) (substantial deference standard applied in sustaining MARAD rules fixing rate structure for subsidized ships in preference trade, stating, "MarAd s attempt to implement the 1970 amendments 'represents a reasonable accommodation of the conflicting policies that were committed to the agency's care by the statute ' (quoting *Chevron U S A. v National Resources Defense Council*, 467 U S. 837, 844-46 (1984))

[4] Moreover, a letter written by the MARAD Administrator in 1969 (when MARAD could rely only on the general authority granted the Secretary under § 204(b) of the MMA) suggests that MARAD did not lay claim to substantial authority in this area prior to the 1970 CPA amendments that gave it specific regulatory authority over other agencies in their administration of cargo preference programs That letter stated "[O]ur surveillance over the program is very limited We have no jurisdiction over the activities of the government agencies that actually ship government-sponsored cargoes ' Letter for the Hon James A Burke, House of Representatives, from J.W Gulick, Acting Administrator, Maritime Administration at 3 (Mar 6, 1969).

respect thereto in accordance with regulations promulgated by the Secretary. . . .

Although the cargo preference program is generally recognized as an important pillar of our maritime policy, its administration has tended to be uneven and chaotic. *A lack of uniform and rational administration has worked to the disadvantage of shippers, carriers, and various geographic areas of our nation,* and has also made it exceedingly difficult to assess and review the overall impact of the program. The situation is easily understandable when one considers the fact that at present each shipping agency administers its own program independently and that none of the agencies primarily involved has an expertise in, or a mandate with respect to, overall U.S. maritime policy.

S. Rep. No. 91-1080, at 19, 58 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4188, 4193, 4232 (emphasis added).[5]

The Committee then explained how it intended to foster uniformity of administration and to advance the basic goals of the CPA by giving the Secretary the power to impose regulatory control over participating agencies in their administration of cargo preference programs. *Id.* at 58-59, *reprinted in* 1970 U.S.C.C.A.N. 4232-33:

Thus, in order to bring some order out of chaos, to correct some of the inequities which have resulted from lack of uniformity in administration, and to facilitate the achievement of the program's objectives . . . the committee amended H.R. 15424 to provide that each agency having responsibilities under section 901(b) of the Merchant Marine Act, 1936, will administer its program in accordance with regulations promulgated by the Secretary . . . . This provision should prove beneficial in bringing some uniformity to the administration of the cargo preference laws. . . . It also has the advantage of giving some control over the administration of laws designed to assist the merchant marine to the government official who has the primary responsibility for the merchant marine — an altogether logical and sound approach.

---

[5] The Senate floor debate on the measure expressed similar sentiments and purposes Senator Magnuson stated that the provision vesting the Secretary with rulemaking authority over the administration of cargo preference programs "should alleviate some of the anomalies and injustices that have resulted from a lack of coordinated administration of cargo preference. Section 901 is promotional legislation and the promotional agency for maritime matters should guide its administration." 116 Cong. Rec. 32,491 (1970)

In adopting the provision referred to in the Senate Report, the Conference Committee expressed a similar legislative purpose:

> There is a clear need for a centralized control over the administration of preference cargoes. In the absence of such control, *the various agencies charged with administration of cargo preference laws have adopted varying practices and policies, many of which are not American shipping oriented.* Since these laws were designed by Congress to benefit American shipping, they should be administered to provide maximum benefits to the American merchant marine. Localizing responsibility in the Secretary . . . to issue standards to administer these cargo preference laws gives the best assurance that the objective[s] of these laws will be realized.[6]

H.R. Conf. Rep. No. 91-1555, at 6 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4260, 4262-63 (emphasis added).

This legislative history confirms that Congress intended the Secretary to have substantial authority and leeway in imposing a degree of uniformity upon other departments and agencies in the administration of their cargo preference programs. *See AMA*, 766 F.2d 545 at 551 (Congress gave MARAD "broad discretion to supervise the implementation of the 1970 amendments"). We therefore must determine whether the promulgation of mandatory charter party terms to govern CPA tenders is properly regarded as an aspect of the "administration" of cargo preference "programs" as those terms are used in the CPA. If so, the proposed charter term regulations would appear to be a proper exercise of the Secretary's statutory authority.

Although the legislative history of the 1970 amendments does not address this precise point, evidence that Congress understood agency administration of cargo preference programs to encompass regulation of charter terms can be found in the Senate Commerce Committee report prepared in 1962 concerning problems in the administration of the cargo preference laws. *See* S. Rep. No. 87-2286 (1962) ("1962 Senate Report"). That report included a summary of various representative episodes in which the Commerce Committee had worked with departments and agencies to achieve results favorable to American shipping interests "in keeping administration of the cargo preference policy in line with the intent of Congress as expressed in the statutes." *Id.* at 3. One of the seven episodes cited by the Committee as "excellent guidance for the future" was described in the Report as follows:

---

[6] The underscored language in the Conference Report could reasonably be viewed as encompassing the very kind of practice addressed by the proposed rulemaking at issue here — i e., the practice of imposing charter terms that are unfavorable to U.S -flag carriers in their efforts to attain and retain at least the statutory minimum share of cargo preference traffic.

Complaints from tramp ship operators that the Department of Agriculture had revised certain procedures for the handling of Government-financed cargoes, to the detriment of U.S.-flag vessel owners, were taken up with Secretary [of Agriculture] Freeman, in a letter by the chairman on June 4, 1962.

The Secretary's reply, under date of July 3, presented the Government's side of the matter, and gave assurance that —

"The Department has recognized the problem presented in your letter concerning *charter terms on U.S. vessels which are sometimes burdensome to owners. We are of the opinion that the adoption of a uniform charter party would be helpful in this matter.* Experience has demonstrated that diverse requirements of individual importing countries make uniformity of charter party terms and conditions difficult to obtain. We have recognized for some time, however, that to the extent practicable uniformity is desirable. To that end, about a year ago a form of charter party was developed, and since that time has been in use for a part of the chartering required under Public Law 480 programs. The possibility of extending the use of the uniform contract is presently being studied."

*Id.* at 7 (emphasis added).

This pertinent material from the 1962 Senate Report strongly indicates that agency "administration" of cargo preference programs has long been understood to encompass the subject of charter terms or "uniform charter party". While we do not regard this 1962 report as actual legislative history on the CPA — since it is not material prepared or contemplated by the same Congress that passed or amended that act — the report does represent pertinent historical material evidencing congressional and executive branch understanding of what the "administration" of cargo preference programs encompasses. Moreover, we are not aware of evidence demonstrating a contradictory understanding of the term in subsequent years.[7]

2. *Implementing the "Reasonable" Rate Standard.* It also appears that MARAD's regulatory authority under section 901(b)(2) would extend to aspects of

---

[7] MARAD called to our attention a 1993 report issued by the House Merchant Marine Committee that touches on this subject, but that report likewise does not constitute legislative history as to the relevant provisions of the MMA and the CPA because it was not issued in connection with the enactment or successful amendment of those acts. *See* H.R. Rep No 103-251, at 56 (1993) Nonetheless, in stating the Commmittee's view that charter terms do fall within the Secretary's regulatory authority under 46 U S.C. app § 1241(b)(2), the 1993 Committee Report lends contemporary reenforcement and continuity to the general congressional understanding indicated in the 1962 Senate Report — i.e , that the regulation or control over charter terms is part and parcel of the "administration of the cargo preference policy " *see* 1962 Senate Report at 3.

cargo preference administration that affect the rates charged by United States-flag carriers. Under section 901(b)(1), U.S. carriers are only eligible for cargo preference to the extent that they charge "fair and reasonable rates for United States-flag commercial vessels." 46 U.S.C. app. § 1241(b)(1). Exercising the Secretary's substantial administrative discretion, MARAD could reasonably conclude that erratic charter party terms imposing increased costs and risks on U.S.-flag carriers might undercut the carriers' ability to calculate and offer rates that are "reasonable." MARAD could also reasonably conclude that the effect of burdensome charter party terms on the rate-setting practices of the U.S. carriers would adversely affect MARAD's ability to apply the "fair and reasonable" rate standard in a correct and consistent manner. Thus, the proposed UCP regulations could be justified on the basis of MARAD's authority to regulate the administration of cargo preference programs in a manner that effectively implements the "reasonable rate" standard of the CPA.

In that regard, we reject USDA's argument (USDA Mem. at 8) that the proposed UCP rules must be "practically indispensable and essential" to the performance of MARAD's statutory responsibilities (quoting from *In re United Missouri Bank of Kansas City, N.A.*, 901 F.2d 1449, 1454 (8th Cir. 1990)) in order to be sustainable. The opinion from which that language was quoted held that an Article I bankruptcy court could not conduct jury trials on the basis of authority allegedly implied by the Bankruptcy Amendments Act of 1984. The reasoning of that opinion, and the test of "necessity" that it employed, have little relevance here, where (1) MARAD's authority to promulgate regulations governing other agencies in the administration of their cargo preference programs is explicit, not implied; and (2) the legislative history of the 1970 amendments unambiguously demonstrates that Congress intended MARAD to use that authority to eradicate agency practices in cargo preference programs that are adverse to the interests of U.S.-flag carriers. *See supra* note 6 and accompanying text.

3. *Reduction of the Rate Gap and Cargo Preference Costs.* The NPRM and MARAD's submissions also indicate that the Government's interest in reducing the costs of the cargo preference program — primarily by reducing the rate gap between American- and foreign-flag carriers — provides an additional valid basis for issuance of the UCP regulations. This contention finds some support in caselaw and legislative history construing the 1970 amendments to the CPA. In the *AMA* case, the court concluded that "Congress clearly intended the 1970 amendments [to the CPA] to reduce the government cost of preference cargo carriage." 766 F.2d at 561.[8] Relatedly, the House Report underlying the 1970 amendments explained

---

[8] The same opinion also concluded that

Congress clearly intended the 1970 amendments . *gradually*, to phase out the expensive and ineffective system of indirect subsidies paid to existing bulk shippers in the form of premium rates for preference cargo carriage

766 F 2d at 549  Rate-gap reductions achievable through UCP regulations would serve that end

how the bill was intended to achieve such cost reductions in the long run: "The aim of the Administration's program and the bill is to enable American bulk carriers, eventually at least, to carry government cargoes at world rates." H.R. Rep. No. 91-1073, at 38 (1970).

MARAD's proposed UCP regulations appear reasonably designed to reduce shipowner costs and risks entailed by burdensome and inconsistent charter party terms, such as those shifting the cost of unloading delays to the shipowner. The reduction in shipowner costs and risks contemplated by the regulations should lead to reduced cargo rates, which in turn would naturally reduce the *government's* costs in subsidizing cargo preference. Therefore, as the court similarly concluded in the *AMA* case, "[W]e believe that MarAd's . . . rule reasonably accomplishes Congress' aim to lower the overall government costs of the preference cargo program . . . ." 766 F.2d at 560.

## C. *Reasonable Participation by Geographic Areas*

The CPA not only requires that U.S.-flag carriers be allocated an overall minimum share of covered cargo, but also requires that the cargo allocation be done "in such manner as will insure a fair and reasonable participation of United States-flag commercial vessels in such cargoes *by geographic areas*." 46 U.S.C. app. § 1241(b)(1) (emphasis added). The meaning of this particular clause of the CPA was explained by the Seventh Circuit in *City of Milwaukee v. Yeutter*, 877 F.2d 540, 543 (7th Cir. 1989), as follows:

> The command . . . speaks of "a fair and reasonable *participation of United States-flag commercial vessels* in such cargoes", not of a fair and reasonable participation of ports or port ranges. Section 1241(b)(1) is special-interest legislation, but the interest is that of U.S.-flag lines, not of ports. "By geographic areas" means "by destination", not "by origin". This ensures that the government can't short-haul domestic carriers. It can't send shipments from Bangor, Maine, to Providence, Newfoundland, on U.S. ships while reserving all the traffic from Philadelphia to Bangkok for foreign bottoms.

Thus, MARAD's regulation under the CPA may include measures intended to assure that U.S.-flag carriers receive a proportional share of CPA shipments to particular geographic destinations, such as the former Soviet republics or other distant regions.

The charter term regulations may also be sustained, therefore, because they facilitate the "reasonable-participation-by-geographic-areas" requirement of the CPA. As stated in the NPRM, vessel dimension and cargo size requirements employed in charter parties used in some countries "often do not match the history of

the port(s) to be served." NPRM at 10. As the NPRM further stated, "Owners who have recently successfully discharged in these ports are now being denied access to cargoes to be shipped to those ports." *Id.*

There has been testimony before Congress that such unfavorable charter party terms have been particularly injurious to U.S.-flag vessels in their efforts to deliver and unload preference cargo bound for Russia and other former republics of the Soviet Union. *See Hearing by Joint Subcomms. on U.S. Flag Shipping Rates on Grain Sales to the Former Soviet Union: Hearing Before the Subcomm. on Agric., Rural Dev., Food and Drug Admin., and Related Agencies and Commerce, State, Justice and Judiciary of the House Comm. on Appropriations,* 103d Cong. 9-13, 57-62 (1993) ("1993 Hearings"). According to this testimony, when adverse charter terms are combined with the chaotic and difficult conditions in Russian ports, the U.S.-foreign freight differential increases and American-flag vessels are disproportionately harmed in the effort to compete for Russia-bound cargoes. *Id.* at 9, 14-15, 57-58.

MARAD could reasonably find that such adverse charter terms might ultimately discourage U.S.-flag carriers from maintaining a reasonable degree of participation in CPA shipments to geographic areas where American shipping interests are disproportionately harmed by such charter terms. Issuing UCP regulations in an effort to prevent that from occurring would appear to be a valid means for MARAD to further the "reasonable geographic participation" standard of the CPA.

## D. *Claims of Conflict with AID's and USDA's Statutory Authority Regarding Transportation Arrangements under the Food Aid Programs*

The 1990 Food Act provides both the Secretary of Agriculture and the AID Administrator with authority to establish competitive bid procedures for the procurement of ocean transportation for the food aid shipment programs they administer. Pub. L. No. 101-624, 104 Stat. 3650 (1990). Thus, 7 U.S.C. § 1736a(a)(2) ("Invitation for bid") provides with respect to USDA:

> All awards in the purchase of commodities or ocean transportation financed under subchapter II of this chapter shall be consistent with open, competitive, and responsive bid procedures, as determined appropriate by the Secretary.

Similar authority is provided to the AID Administrator under 7 U.S.C. § 1736a(d)(2) with respect to the programs he administers.[9] Additionally, 7 U.S.C. § 1736a(d) provides as follows with respect to USAID program cargo arrangements:

---

[9] That subsection provides that purchases of ocean transportation under the relevant programs must be made "on the basis of full and open competition utilizing such procedures as are determined necessary and appropriate by the Administrator." *Id*

(1) Acquisition.— The Administrator [of USAID] shall transfer, *arrange for the transportation*, and take other steps necessary to make available agricultural commodities to be provided under sub-chapter[s] III and . . . III-A of this chapter.

. . . .

(4) Ocean transportation services. — Notwithstanding any provision of the Federal Property and Administrative Services Act of 1949 (40 U.S.C. 471 *et seq.*) or other similar provisions relating to the making or performance of Federal Government contracts, the Administrator may procure ocean transportation services under this chapter *under such full and open competitive procedures as the Administrator determines are necessary and appropriate.*

(Emphasis added.) These provisions thus authorize USAID to arrange for the shipment of Public Law 480 cargoes under such "competitive procedures" as the Administrator considers "necessary and appropriate."

USDA and USAID contend that the charter party regulations proposed by MARAD are incompatible with their authority to establish the competitive procedures they deem appropriate for the procurement of food aid shipping arrangements.

There is nothing to indicate that the "competitive procedures" provisions of the 1990 Food Act were intended to interfere with the Secretary of Transportation's administration of the Cargo Preference laws. *See* S. Rep. No. 101-357, at 169 (1990), *reprinted in* 1990 U.S.C.C.A.N. at 4825. On the contrary, the legislative history of the 1990 Food Act states as follows: "None of the revisions to Public Law 480 contained in this legislation are intended to modify, alter or reduce the 75[%] U.S. flag shipping requirement provided for under current law." *Id.*

We conclude that the Food Act's competitive procedures provisions can be reconciled with MARAD's authority to regulate the administration of USDA's and USAID's cargo preference programs.[10] For example, Congress plainly did not believe that the competitive procedures provisions would be incompatible with the basic 75% cargo preference set-aside for U.S.-flag vessels, *see id.*, which imposes far more severe restrictions on competition than those presented by UCP regulations. Rather, the Food Act provisions authorize USDA and USAID to establish

---

[10] The requirement for sealed bidding on all CPA charter parties initially proposed by the petitioning shipowner, but not included by MARAD in the NPRM it proposed, would appear to present another matter Whether or not to require sealed bidding would seem to be the very kind of "competitive procedures" that were left to the determination of USDA and USAID under the 1990 Food Act However, we do not understand MARAD's request for opinion to extend to this issue, since MARAD itself declined to include a sealed bidding requirement in its draft NPRM.

competitive procedures for the procurement of ocean transportation in a manner that is compatible with the requirements of the CPA. *Cf. AMA*, 766 F.2d at 561 n.25 ("Congress clearly intended MarAd to control the subsidized carriage of preference cargoes and that shipper agencies would adjust their preference cargo procedures to conform with MarAd's."). We find nothing in the 1990 legislation or its legislative history indicating that USDA or USAID authority over the terms of charter parties was considered necessary to the establishment of competitive procurement procedures. Uniform charter party regulations would merely represent an element of the unique cargo preference trade environment *within which* USAID and USDA have been authorized to establish competitive procurement procedures.[11]

### E. *Allocation v. Availability*

USDA and USAID also contend that MARAD's proposed imposition of UCP is fundamentally different than the kind of regulatory authority contemplated under the CPA — i.e., the authority to assure that a 75% share of cargo subject to the CPA is allocated to U.S.-flag carriers "to the extent such vessels are available at fair and reasonable rates," 46 U.S.C. app. § 1241(b)(1). *See* USAID Mem. at 17-20; USDA Mem. at 8-15. The covered agencies have consistently satisfied the CPA's 75% requirement for eligible U.S-flag vessels, and MARAD does not contend otherwise. The opposing agencies therefore contend that the proposed UCP regulations are unnecessary and bear no valid relationship to what they view as MARAD's limited statutory authority. In this regard, the more favorable charter terms proposed by the NPRM would presumably affect the overall and long-term availability of rate-qualified U.S. carriers rather than MARAD's application of the 75% preference requirement to the pool of available U.S.- and foreign-flag carriers. Thus, this dispute also raises the question whether the CPA grants MARAD the authority to take regulatory action designed to encourage the *availability* of qualifying U.S.-flag carriers but not directly related to the *allocation* of preference cargo among the available and eligible carriers.

MARAD's allocation authority is largely inconsequential unless there is a substantial number of U.S. merchant vessels "available" to take on the preference cargo at reasonable rates. *Cf. Yeutter*, 877 F.2d at 541-45 (agencies could properly allocate cargo preference tonnage on a nationwide, rather than port-by-port, basis; effect of this action was to force diversion of cargo preference shipping of Midwest

---

[11] Although the point is not pressed in the submissions, we assume that MARAD's authority under the proposed rule to review and approve freight tenders for preference cargo prior to release to the trade would be exercised in a manner that would not unreasonably delay or impede the affected agencies' ability to issue freight tenders in a timely fashion If MARAD s actual practice in exercising such authority unduly interfered with the affected agencies' food aid operations, it might well exceed even its expansive statutory authority in this area *See* S Rep. No 74-713, at 4 (although MARAD s discretionary authority to deal with problems falling within its jurisdiction is "considerable," it nonetheless "must have limits")

grain from more cost-effective Great Lakes ports, where U.S. carriers did not oper-
ate and were thus not "available," to more distant coastal ports, where they were
"available"). For MARAD to enforce the 75% requirement on behalf of a sparse
and dwindling fleet of available U.S. carriers would do little to further the broad
objectives of the MMA and the CPA — i.e., to assure the maintenance of a vigor-
ous and competitive U.S. merchant fleet. We conclude therefore that MARAD's
regulatory jurisdiction encompasses administrative measures designed to foster the
availability of reasonable-rate U.S. vessels to pursue the preference trade, as well
as overseeing the allocation of the minimum cargo preference percentages.

That leaves the question of whether the proposed UCP regulations represent a
reasonable means of seeking to enhance or sustain U.S.-flag vessel availability for
the preference trade. We think that the proposed regulations do pass that test. As
demonstrated by the 1962 Senate Report quoted above, the relevance of charter
terms to effective implementation of the cargo preference program was recognized
by the Secretary of Agriculture over 30 years ago.

In the absence of any restrictions sensitive to U.S. merchant fleet concerns,
onerous and erratic charter party terms might deter some U.S.-flag carriers from
pursuing their statutory share of cargo preference trade. Although USDA and
USAID reasonably point out that U.S. carriers may include the increased costs
caused by adverse charter terms in their proposed rates, and although MARAD
retains considerable discretion to approve such rate increases as reasonable, that
discretion is not unlimited. Rates could conceivably be raised to a level that is
objectively too high for the United States to continue to sustain within realistic
budgetary constraints. Further, rote approval of escalating charter-driven rate in-
creases would conflict with MARAD's duty to "*reduce* the government cost of
preference cargo carriage," *AMA*, 766 F.2d at 561, in keeping with the goals of the
1970 Amendments.

## F. *MARAD Authority to Fix Freight Rates*

Another argument against MARAD's proposed regulation is that it is designed
to reduce the rates charged by U.S.-flag carriers, whereas USDA contends that
MARAD lacks authority to fix rates (USDA Mem. at 14-18). In support of this
contention, USDA relies upon the Fifth Circuit's observation in *United States v.
Bloomfield Steamship Co.*, 359 F.2d 506, 509 (5th Cir. 1966), *cert. denied*, 385
U.S. 1004 (1967), that, "[T]here is nothing in the Cargo Preference Act that indi-
cates that it is intended to fix freight rates." USDA Mem. at 16.

Whether or not MARAD has such authority, the proposed MARAD regulation
would not "fix freight rates." It instead aims to remove obstacles to the reduction
of the rate gap between the U.S. merchant fleet and foreign-flag carriers that might
otherwise occur in the absence of such obstacles.

Placed in context, the Fifth Circuit's statement in *Bloomfield* does not signifi-
cantly relate to the issue presented here. That statement was made in the course of

demonstrating that Congress did not intend to provide still further subsidies to U.S. shipowners "by having the Government pay *higher* rates for shipping than it might bargain for." 359 F.2d at 509 (emphasis added). More specifically, the *Bloomfield* opinion rejected the proposition that the CPA was intended to *prohibit* rates for U.S. carriers that "are lower than rates shown to be fair and reasonable." *Id.* at 509-10. The quoted statement from *Bloomfield*, and the holding of which it was a part, simply do not address the distinct issue of whether MARAD could properly take regulatory measures designed to reduce the "rate gap" between U.S. and foreign carriers in the interests of fostering a more competitive and cost-efficient U.S. merchant fleet. The reduction of that rate gap could advance the overall competitive interests of the U.S. merchant fleet and help reduce the costs of the cargo preference program.

## Conclusion

To conclude that issuance of UCP regulations exceeds the Secretary's authority would require an overly narrow construction of the mandates of the MMA, the CPA, and the 1970 amendments. MARAD's authority under those statutes is not limited to rote application of the statutory percentage formula to whatever number of U.S. shipowners find it profitable to apply for CPA shipments. Rather, MARAD may regulate the administration of cargo preference programs with a view to achieving recognized goals of the MMA and the CPA: developing a merchant fleet that is at "parity with foreign competitors," *Peterson*, 518 F.2d at 1076; reducing the costs of the cargo preference program, *AMA*, 766 F.2d at 561; and eradicating divergent agency practices in the preference trade that are "not American shipping oriented," H.R. Conf. Rep. No. 1555, at 6, *reprinted in* 1970 U.S.C.C.A.N. at 4262. MARAD could reasonably conclude that erratic and burdensome charter party terms hinder the achievement of those goals, and it follows that UCP regulations aimed at eliminating such terms would be a valid exercise of MARAD's authority under sections 204(b) and 901(b) of the MMA.

WALTER DELLINGER
*Assistant Attorney General*
*Office of Legal Counsel*
